HEINZ BINDER, #87908
ROBERT G. HARRIS, #124678
JULIE H. ROME-BANKS, #142364
ROYA SHAKOORI, #236383
Binder & Malter, LLP
2775 Park Avenue
Santa Clara, CA 95050
Telephone: (408)295-1700
Facsimile: (408) 295-1531
email: heinz@bindermalter.com
email: rob@bindermalter.com
email: julie@bindermalter.com
email: roya@bindermalter.com

Attorneys for Debtor
Alpha Factors

**UNITED STATES BANKRUPTCY COURT**

**NORTHERN DISTRICT OF CALIFORNIA, DIVISION 5**

| | |
|---|---|
| In re | Case No. 08-54475-SLJ |
| ALPHA FACTORS, dba Century 21 Alpha, a California corporation, | Chapter 11 |
| Debtor. | Date: December 2, 2010<br>Time: 2:00 p.m.<br>Courtroom: 3099<br>Judge: Honorable Stephen L. Johnson |

**DEBTOR'S FIRST AMENDED DISCLOSURE STATEMENT**
**(November 29, 2010)**

Case: 08-54475    Doc# 199    Filed: 11/29/10    Entered: 11/29/10 15:32:34    Page 1 of 33

# Table of Contents

I. INTRODUCTION. ................................................................5

A. The Purpose Of A Disclosure Statement: ...........................5

B. Definitions: .................................................................5

C. How to Vote ................................................................6

D. Enclosures. ................................................................6

II. GENERAL BACKGROUND ................................................6

III. EVENTS LEADING TO CHAPTER 11 FILING .......................7

IV. RELEVANT EVENTS IN CASE ..........................................7

A. Case Commencement ...................................................8

B. Cash Collateral ...........................................................8

C. Rejection of Burdensome Leases and Executory Contracts and Abandonment Motion ...........................................................8

D. Extension of Time To Assume Or Reject Office Lease ............8

E. Approval of Replacement San Jose Lease and Rejection of Prior San Jose Lease ..................................................................9

F. Settlement of Pruneyard Lease Claims and Cross-Claims ........9

G. Settlement of Century 21 Franchise Claims .......................10

H. Income While in Chapter 11 ..........................................10

V. PLAN OF REORGANIZATION ..........................................10

A. Plan Summary. ..........................................................11
   1. Executive Summary of Plan. .....................................11
      Class One (Century 21 Claims). .................................11
      Class Two (Dalton Matter Claims) ..............................11
      Class Three (Allowed Secured Claims of (i) Thang M. Nguyen and Ashley Huong Le, (ii) County of Santa Clara Tax Collector, and (iii) and other Allowed Secured Claims) ...........................................12

Class Four (General Unsecured Claims). ...................................................13

Class Five  (Insider Claims). ...............................................................13

Class Six (Equity Interests) .................................................................14

2. Impairment and Voting ...................................................................14

3. Means For Implementation Of The Plan. ...........................................14

a. Sources of Funding. ......................................................................14

4. Executory Contracts ......................................................................15

5. Disputed Claims. ...........................................................................16

a. Claim Objections. ........................................................................16

b. Disputed Claims Reserve Account. ................................................16

6. Post-Confirmation Compensation and Reimbursement of Professionals...17

7. Post-Confirmation Notice. ..............................................................17

8. Plan Completion. ...........................................................................17

VI. ALTERNATIVES TO THE PLAN. .......................................................18

A. General. .......................................................................................18

B. Best Interests Test ........................................................................18

C. Analytical Comparison To Chapter 7 ................................................19

1. Accounts Receivable ....................................................................19

2. Deposits and Retainers. ...............................................................20

3. Furniture and Fixtures, Office Equipment. ......................................20

4. Leasehold Improvements. ............................................................21

5. Cash on Hand. ............................................................................21

6. Administrative Claims. .................................................................21

VII. FEASIBILITY ................................................................................22

A. Payments Due At The Effective Date ...............................................23

B. Payment Due at the End of The First Quarter After The Effective Date..........23

C. Conditions Needed for Plan to Become Effective ...............................24

VIII. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN .................26

A. IRS Circular 230. ..........................................................................27

B. Consequences to the Debtor. .........................................................28

C. Consequences to Creditors. ..........................................................28

IX. CONFIRMATION STANDARDS. .........................................................30

Case: 08-54475   Doc# 199   Filed: 11/29/10   Entered: 11/29/10 15:32:34   Page 3 of
33

**A.**   **Voting.** ................................................................**30**

**B.**   **Confirmation Standards** ..............................................**30**

**C.**   **Modification.** .......................................................**32**

**X.**  **CONCLUSION.** ...........................................................**32**

**A.**   **Effect of Confirmation.** .............................................**32**

**B.**   **Recommendation.** ...................................................**32**

Case: 08-54475    Doc# 199    Filed: 11/29/10    Entered: 11/29/10 15:32:34    Page 4 of 33

THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA AS CONTAINING ADEQUATE INFORMATION FOR SOLICITATION OF ACCEPTANCES OF THE DEBTORS' PLAN OF REORGANIZATION (AUGUST 4, 2010).  DISTRIBUTION OF THIS DISCLOSURE STATEMENT TO CREDITORS HAS BEEN AUTHORIZED BY ORDER OF THE UNITED STATES BANKRUPTCY COURT.

## I. INTRODUCTION.

A.      The Purpose Of A Disclosure Statement:

Debtor and Debtor-in-Possession ALPHA FACTORS, dba Century 21 Alpha, a California corporation ("Debtor") prepared this Debtor's Disclosure Statement.  It is distributed to creditors to solicit acceptances of the Debtor's Plan of Reorganization ("Plan").  The Plan is served with the Disclosure Statement.  This Disclosure Statement's purpose is to provide all persons who hold claims against the Debtor with information adequate to enable them to make informed judgments about the Plan in voting to accept or reject the Plan.  The Disclosure Statement only summarizes the Plan.  You should read the Plan carefully and make sure that you understand its terms.  If any statement in this Disclosure Statement conflicts with the Plan, the terms of the Plan control.

B.      Definitions:

This Disclosure Statement uses terms which are defined in the Plan.  A term used in this Disclosure Statement or the Plan that is defined in the Bankruptcy Code has the meaning given to that term in the Bankruptcy Code.  The rules of construction contained in the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure apply in this Disclosure Statement.  To the extent that terms defined in the Plan or Disclosure Statement are inconsistent with definitions or meanings provided by the Bankruptcy Code or Rules, the Bankruptcy Code and Rules shall control.

Case: 08-54475    Doc# 199    Filed: 11/29/10    Entered: 11/29/10 15:32:34    Page 5 of 33

1      C.      How to Vote.

2      A vote for acceptance or rejection of the Plan may be cast by completing and

3  signing the ballot which accompanies the Plan and mailing it to Binder & Malter, 2775

4  Park Avenue, Santa Clara, CA 95050, to the attention of Julie H. Rome-Banks, Esq. in

5  an envelope marked "Alpha Factors Ballot" in the lower left hand corner.  Only the Ballot

6  should be mailed.  For your vote to be counted, your completed Ballot must be received

7  no later than January __, 2011, by 5:00 p.m., Pacific Daylight Savings Time.  Upon its

8  Confirmation, the Plan will be binding on all creditors regardless of whether a creditor

9  has voted in favor of or rejected the Plan.  Ballots must be sent by mail or other delivery

10 so that the original signed ballots are actually received by Debtor's counsel; ballots sent

11 by facsimile or email shall not be counted.

12     D.      Enclosures.

13     Enclosed with this Disclosure Statement is a copy of the Plan, a ballot (if your

14 claim is to be impaired under the Plan) and the order approving this Disclosure

15 Statement.

16                    II. GENERAL BACKGROUND

17

18     The Debtor was incorporated in 1978.  The Debtor is a licensed California real

19 estate broker.  The Debtor has operated under franchise agreements with Century 21

20 Real Estate LLC ("Century 21") since approximately 1978. At the height of the real

21 estate boom in Santa Clara County in the early 2000's, the Debtor had 7 offices in

22 Santa Clara County including locations in Los Gatos, Milpitas, San Jose, Campbell and

23 Los Altos, and employed over 200 brokers, agents and other support personnel.

24     The Debtor's President and Sole Shareholder have at all times been Edward Z.

25 Zimbrick.

26

27

Case: 08-54475    Doc# 199    Filed: 11/29/10    Entered: 11/29/10 15:32:34    Page 6 of
33

III. <u>EVENTS LEADING TO CHAPTER 11 FILING</u>

The Debtor's economic problems are the combined result of the general economic downturn in the United States and in Silicon Valley in particular that began in approximately 2006 and have continued into the Great Recession.  In addition, the Debtor had a dispute with franchisor Century 21 that resulted in the Debtor filing a civil action in 2008 in the Northern District of California.  The Debtor reached a settlement with Century 21 resulting in the dismissal of that lawsuit in August 2008.

Prior to the petition date, the Debtor had ceased business operations in all but 2 of its locations in Santa Clara County and returned possession under the non-residential leases to those affected real property lessors prior to filing bankruptcy.  In addition, several of the locations which the Debtor has returned possession were subject to subleases and personal guaranties by the Debtor's President, Edward Zimbrick. Several of these landlords commenced unlawful detainer and/or breach of lease actions against the Debtor which were pending when the bankruptcy case was filed.  The Debtor filed a voluntary petition under chapter 11 on August 15, 2008. Because of leases and other business debts that had been personally guaranteed, Edward Zimbrick and his wife Daija Zimbrick also filed a joint voluntary petition under chapter 11 on August 15, 2008.[1]

IV. <u>RELEVANT EVENTS IN CASE</u>

---

[1] Some creditors will also receive a copy of the Zimbrick Disclosure Statement and Plan directly from Zimbrick's counsel.  Any creditor or interested party in this case may also request a copy of the Zimbrick documents from Binder & Malter LLP at the address shown on the first page of this Disclosure Statement.

Case: 08-54475    Doc# 199    Filed: 11/29/10    Entered: 11/29/10 15:32:34    Page 7 of 33

A.   Case Commencement

The Debtor filed its voluntary petition under chapter 11 of title 11 of the United States Code on August 15, 2008.  The Debtor continues to operate as a debtor-in-possession pursuant to 11 U.S.C. §§ 1107 and 1108.

B.   Cash Collateral

The Debtor entered into a stipulation with secured creditors Leaf Financial Corporation ("Leaf") and Thang and Ashley Huong Le (the "Nguyens") for use of cash collateral.  The stipulation was approved by the Court in October 2008.

C.   Rejection of Burdensome Leases and Executory Contracts and Abandonment Motion

The Debtor has brought several motions to reject real property leases and subleases, as well as other executory contracts such as office equipment leases, maintenance and similar contracts, mortgage broker agreements and consulting agreements that either had been terminated or abandoned by the Debtor or the other party to the contract prior to the petition date, or the Debtor no longer has use for such items because of the location of many of its prior offices which made the ongoing monthly contract payments burdensome.  These motions were approved by the Court and deadlines for rejection claims were established and served on the effected parties. Subsequently, following entry of orders rejecting equipment leases, several of the equipment lessors refused to retrieve their equipment collateral.  It was therefore necessary for the Debtor to obtain Court approval to abandon or otherwise dispose of those items of personal property which were burdensome for the Debtor to store.

D.   Extension of Time To Assume Or Reject Office Lease

DEBTOR'S FIRST AMENDED DISCLOSURE STATEMENT

On the Petition Date, the Debtor still operated from its main San Jose and Campbell offices. On multiple occasions, the Debtor sought to extend the time to assume or reject those real property leases and/or subleases. The affected landlords approved such extensions and the motions were granted.

E.    Approval of Replacement San Jose Lease and Rejection of Prior San Jose Lease

While in bankruptcy, the Debtor was able to take advantage of rising vacancy rates in the San Jose area and commensurately lower leasing rates. When the Debtor's existing landlord in San Jose, Monterey Plaza was unwilling to negotiate a rent reduction to be more in line with reduced rents in the area, the Debtor was able to negotiate a new lease for 5978 Silver Creek Valley Road, Suite 50, San Jose, California at rates that were more favorable.   Even when considering the effect of a potential lease rejection claim by Monterey Plaza, the savings in reduced rent over the life of the new lease were substantial and would facilitate a plan of reorganization by further reducing the Debtor's overhead expense for rent. As a result, the Debtor filed a motion to approve the new lease for the Silver Creek location and to reject its lease with Monterey Plaza, which was approved by the Court.

F.    Settlement of Pruneyard Lease Claims and Cross-Claims

As a result of a pre-bankruptcy dispute with its former landlord CA-Pruneyard Limited Partnership ("Pruneyard"),  the Debtor had filed a lawsuit seeking rescission of and damages relating to that lease.  The landlord filed a Cross-Complaint for unpaid rent and breach for the lease against Alpha Factors and to enforce a personal guaranty against the Zimbricks on or about February 27, 2008.  After the petition date, the lawsuit

Case: 08-54475    Doc# 199    Filed: 11/29/10    Entered: 11/29/10 15:32:34    Page 9 of 33

was removed to Bankruptcy Court.  The Debtor, Zimbricks and Pruneyard thereafter

settled their disputes by settlement agreement approved by the Court whereby

Pruneyard received an agreed unsecured claim of $368,182.51 in both bankruptcy

cases.

G.    Settlement of Century 21 Franchise Claims

As part of the resolution of its litigation with Century 21 in 2008, the Debtor

agreed to an extension of its franchise agreements, extending the agreements to

December 31, 2018.  The parties also agreed that the Debtor owed  certain deferred

franchise service fees.  In order to facilitate the Debtor's financial recovery, Century 21

agreed to terms under which the Debtor would repay the deferred franchise service fees

as well as for restructuring of franchise fees  and certain advertising fees going forward.

 The parties agreed that these fees would be treated as approved administrative

expenses and the settlement was approved by Court order entered on August 6, 2009.

H.    Income While in Chapter 11

Through its efforts to reduce overhead expenses, including rejection of

burdensome leases and executory contracts, the Debtor has become profitable while in

chapter 11.  Attached hereto as Exhibit "A" and incorporated herein by reference is a

summary of the monthly operating reports that the Debtor has filed with the Bankruptcy

Court.  Although the Debtor was not consistently profitable in first 8 months of this

bankruptcy case, the Debtor's operations have stabilized over the past 16 months.

Cumulative profits since the bankruptcy case was filed amount to $195,560 through July

31, 2010.

V.  PLAN OF REORGANIZATION

Case: 08-54475    Doc# 199    Filed: 11/29/10    Entered: 11/29/10 15:32:34    Page 10 of 33

A.   Plan Summary.

1.   Executive Summary of Plan.

**The following is a creditor-by-creditor summary of Plan treatment approved**

**by the Bankruptcy Court.  For greater detail please read the Plan and its specific**

**language pertaining to any particular claimant or claimants:**

**Class One (Century 21 Claims)** consists of the allowed unsecured and

administrative claims of franchisor Century 21, based upon the franchise agreement

between the Debtor and Century 21.  Pursuant to the approved stipulation between the

Debtor and Century 21, the Debtor will pay a franchise fee equal to 7% as and when set

forth in the Franchise Agreement, with 1% of said fee being applied to the accrued

Deferred Fees until the full amount of the Deferred Fees is paid in full.  Moreover, 25%

of any CIB payments to which the Debtor is entitled under the Franchise Agreement

after January 1, 2010 shall be applied to payment of the Deferred Fees until the full

amount of the Deferred Fees is paid in full.  On the Effective Date, Century 21

withdraws its Proof of Claim in the amount of $250,000.00 previously filed in this

Bankruptcy Case on September 8, 2008 and Century 21 shall hold no other pre-petition

Allowed Claim. The Debtor will assume its Franchise Agreement with Century 21 as

previously amended by the parties.  This class is impaired.

**Class Two (Dalton Matter Claims)** consists of the claims of  Vera Dalton,

William Corbin and Dianne Lambert and their counsel.   Holders of Class Two Claims

shall receive an assignment of the Debtor's rights and coverage against CIGA in

satisfaction of the Class Two Allowed Claims.  The Debtor shall dismiss its pending

appeal in the Dalton Matter and shall execute such documents as may reasonably be

needed to aid the holders of the Class Two Claims in their pursuit of payment from CIGA. The Class Two claimants shall be entitled to no other source of recovery from the Debtor. This class is impaired.

**Class Three (Allowed Secured Claims of (i) Thang M. Nguyen and Ashley Huong Le, (ii) County of Santa Clara Tax Collector, and (iii) and other Allowed Secured Claims)** Nguyen and Le shall receive payment of their Allowed Secured Claim (scheduled in the amount of $25,000.00) consistent with their legal, equitable, and contractual rights unaltered, including their retention of any lien to the extent not avoidable Upon the full payment of any the Allowed Class Three Claim of Nguyen and Lee, any and all liens or security interests of any nature whatsoever held by Nguyen and Lee shall be deemed discharged. Nguyen and Le's claim is not impaired under the Plan. The County of Santa Clara Tax Collector has filed a proof of Claim as a secured Claim in the amount of $882.94 for a recorded tax lien. The County shall retain its lien. The County shall receive payment in full of its Allowed Secured Claim with statutory interest not later than 30 days after the Effective Date. Upon payment in full of the Allowed Secured Claim of the County, any and all liens or security interests of any nature whatsoever held by the County shall be deemed discharged. The County's claim is not impaired under the Plan. The Debtor does not believe that there are other any holders of Allowed Secured Claims in Class Three. However, to the extent that any such additional Allowed Secured Claims exist, such Allowed Secured Claims are not impaired under the Plan, as the Plan leaves their legal, equitable, and contractual rights unaltered, including their retention of any lien to the extent not avoidable. Each such Allowed Secured Claim shall be considered to be a separate subclass within Class

Three, and each such subclass shall be deemed to be a separate Class for purposes of the Plan.  Upon the full payment of any Allowed Class Three Claims, any and all liens or security interests of any nature whatsoever held by each Class Three Creditor shall be deemed discharged.  This class is unimpaired under the Plan.

**Class Four (General Unsecured Claims)** consists of the Allowed Claims of general unsecured, non-priority creditors who are not "insiders", as that term is defined in 11 U.S.C. §101(31).  The total amount of  scheduled and filed Class Four Claims is approximately $6.5 million.  After reduction for  Class Five Insider Claims of $2.96 million, this leaves a total of Class Four Claims of  approximately $3.6 million.  Of this amount, the Debtor anticipates that the $250,000 Claim of Century 21 will be waived pursuant to the treatment of Century 21 under Class One of the Plan.  In addition, the amount of Class Four Claims that are wholly or partly disputed by the Debtor and are expected to be disallowed is an additional $1.53 million.  The Debtor therefore anticipates that following Claim Objections and after the Effective Date, the total Allowed Class Four Claims will be approximately $1.820 million.  Holders of Allowed Class Four Claims shall be entitled to receive pro-rata Distributions under the Plan from the Plan Distribution Account for a period of 5 years.   The Debtor will pay $25,000 per quarter for a period of 5 years into the Plan Distribution Account and will make pro-rata payments to creditors holding Allowed Class Four Claims from the Plan Distribution Account.  This class is impaired.

**Class Five  (Insider Claims)** consists of the Allowed Claims of insiders, including Edward Zimbrick in the amount of $2,389,310.82 and Daija Zimbrick in the amount of $537,500.00.  Under the Plan, the insiders shall receive nothing on account

Case: 08-54475   Doc# 199   Filed: 11/29/10   Entered: 11/29/10 15:32:34   Page 13 of 33

of their claims until the Plan is fully performed.  Notwithstanding, the Debtor shall otherwise assume all obligations of indemnification under its Employment Agreement with Edward Zimbrick as amended.  The Zimbricks' claims for pre-petition wages and loans made to the Debtor shall be subordinated to the payment of all other classes of Allowed Claims as provided for in the Plan.  The Class Five Claims shall remain obligations in full of the Debtor and shall not otherwise be discharged under the Plan.  This class is impaired.

**Class Six (Equity Interests)** consists of the equity interests of Edward Zimbrick, holder of 100% of the issued shares of the Debtor.  Mr. Zimbrick shall retain his stock and all rights thereunder under the Plan, except as expressly modified by the Plan.  This class is not impaired.


      2.   <u>Impairment and Voting</u>

The holders of Allowed Claims in Classes 1, 2, 4 and 5 are impaired within the meaning of that term under the Bankruptcy Code and may vote as to whether to accept or reject the Plan.

      3.   <u>Means For Implementation Of The Plan</u>.

          a.   <u>Sources of Funding</u>.

The Debtor shall effectuate the Plan through its continued operations as a real estate broker franchised by Century 21 and all related business activities.  The Debtor shall give notice of the Effective Date of the Plan.  The Debtor shall pay $25,000 per quarter for a period of 5 years into the Plan Distribution Account (for a total of $500,000) and will make pro-rata payments to creditors holding Allowed Claims from the Plan

Case: 08-54475   Doc# 199   Filed: 11/29/10   Entered: 11/29/10 15:32:34   Page 14 of 33

Distribution Account on an annual basis. The first payment into the Plan Distribution Account shall be made by the Debtor not later than the first business day of the first calendar quarter following the Effective Date of the Plan. Payments by the Debtor into the Plan Distribution Account shall continue to be made on the first business day of each calendar quarter thereafter.

Distributions to creditors shall be made pro-rata from the Plan Distribution Account (after making the appropriate reserves for the Disputed Claims Reserve Account) on the Distribution Dates. The first Distribution Date shall be not later than one year after the Effective Date and subsequent Distribution Dates shall be on each anniversary date thereafter until the Plan Distribution Account proceeds have been distributed to creditors with Allowed Claims pursuant to the Plan. The Debtor shall not use the funds in the Plan Distribution Account for its costs of operations. The Reorganized Debtor shall act as the Disbursing Agent under this Plan of Reorganization.

The Reorganized Debtor shall be entitled to defer up to two quarterly payments into the Plan Distribution Account under the term of this Plan, which deferrals may last until the following calendar quarter, provide the Debtor shall give notice before the due date of such quarterly payments that the Debtor seeks to defer.

4. <u>Executory Contracts</u>

The Debtor is the lessee under non-residential real property leases for its two business offices at 5978 Silver Creek Valley Road, Suite 50, San Jose, California, and 415 Hamilton Avenue, Campbell, California. On the Effective Date, these leases shall be assumed in accordance with the provisions of Section 365 and Section 1123 of the

Bankruptcy Code.  These leases were entered into after the Petition Date. The Debtor believes that the payments under both of these leases are current.

On the Effective Date, the Debtor shall also assume its Franchise Agreement with Century 21 as previously amended.

Also on the Effective Date, the Debtor shall commence making payments to and provide benefits to Edward Zimbrick as stated in the Plan under the section entitled "Post Confirmation Salary of Edward Zimbrick" and assume all other obligations under the Employment Agreement with Edward Zimbrick as amended, except that the Class 5 Insider Claims of Edward and Daija Zimbrick for any pre-petition compensation and pre-petition loans to the Debtor shall be subordinated to the payment of all other classes of Allowed Claims as provided for in the Plan.

Except as expressly set forth herein or in a supplement to this Plan to be filed prior to the hearing on confirmation, all other leases and executory contracts to which the Debtor is a party and which have not previously been rejected by prior order of the Court shall be deemed rejected on the Effective Date.   Rejection Claims shall be classified as Class 4 general unsecured Claims.

5.      Disputed Claims.

a.      Claim Objections.

An objection to a Claim shall be filed no later than the Claims Objection Date.  An objection to an Administrative Claim shall be filed no later than the Administrative Claims Objection Date.  Any party in interest may file an objection to a Claim or Administrative Claim.

b.      Disputed Claims Reserve Account.

Subject to the next sentence, any cash that would be distributed to the holder of a Disputed Claim if it were an Allowed Claim on any Distribution Date hereunder shall be set aside into the Disputed Claims Reserve Account. Not later than fifteen (15) days after the Reorganized Debtor has notice that a Disputed Claim has been Allowed in whole or in part, the Reorganized Debtor shall distribute the cash deposited into the Disputed Claims Reserve Account on account of such Disputed Claim.

6. <u>Post-Confirmation Compensation and Reimbursement of Professionals.</u> All professionals employed by the Reorganized Debtor after the Confirmation Date shall be entitled to payment of their reasonable post-Confirmation Date fees and reimbursement of expenses on a monthly basis without notice.

7. <u>Post-Confirmation Notice.</u>

Whenever the Plan requires a Person to comply with the Notice Procedure, such Person seeking the particular relief shall be required to serve a written notice on the Notice Parties of the proposed action. Such Person shall be authorized to take any action proposed to be taken in such notice fifteen (15) days after service of such notice unless, before the expiration of such fifteen (15)-day period, a recipient Notice Party has filed an objection to such proposed action with the Bankruptcy Court and scheduled a hearing on such objection within thirty (30) days after the filing of such objection and upon not less than twenty-one (21) days notice to all Notice Parties. If any such objection is filed, the Person seeking the particular relief shall not take the proposed action unless the Bankruptcy Court approves such action or the objecting party withdraws the objection.

8. <u>Plan Completion.</u>

Case: 08-54475    Doc# 199    Filed: 11/29/10    Entered: 11/29/10 15:32:34    Page 17 of 33

The Plan shall be considered Substantially Consummated when (i) the Effective Date of the Plan has occurred; (ii) the Debtor has funded the first two payments of $25,000.00 each into the Plan Distribution Account, and (iii) the Debtor has made the first distribution to creditors with Allowed Claims from the Plan Distribution Account.

## VI. ALTERNATIVES TO THE PLAN.

### A. General.

The Debtors believes that the Plan provides creditors with the greatest value that can likely be obtained on their respective claims. The alternative to Confirmation of the Plan is liquidation under Chapter 7 of the Bankruptcy Code.

### B. Best Interests Test

The "best interest test" of Bankruptcy Code §1129(a)(7)(A)(ii) requires that a plan provide to each dissenting member of each impaired class a recovery that has a present value at least equal to the present value of the distribution which each such creditor would receive if the Debtor's bankruptcy estate were liquidated under chapter 7 of the Bankruptcy Code. In performing this analysis, the Bankruptcy Court must determine the amount that would be generated from a chapter 7 liquidation of the Debtor's assets after deducting the cost of liquidation. The cost of liquidation would include the commissions of a chapter 7 trustee, the trustee's expenses, fees for counsel and other professionals retained by the trustee, and other administrative claims. Generally, no distribution is made in a chapter 7 case until all assets of the Bankruptcy Estate and all claims have been liquidated, a process that often can take many months and sometimes years.

Case: 08-54475    Doc# 199    Filed: 11/29/10    Entered: 11/29/10 15:32:34    Page 18 of 33

C.     Analytical Comparison To Chapter 7

Determining what unsecured claimants would receive in a liquidation requires an analysis of each of the Debtor's assets to determine (1) the price at which the chapter 7 trustee could sell them, (2) what the net proceeds would be in the event of a sale, and (3) what the deductions would be for administrative and priority claims and chapter 7 fees and expenses.

1.     Accounts Receivable

The Debtor generates accounts receivable for real estate brokerage commissions when a property that the Debtor has listed for sale becomes subject to a contract of sale, or the Debtor obtains a buyer for a property that has been listed for sale by another real estate broker. The commissions vary in amount from 2.5% to 6% of the sales price depending on the particular circumstances of the sale and whether other cooperating real estate brokers are involved.  These commissions are then paid to the Debtor when the escrow for the sale of the property is closed.

When an account receivable is created, the Debtor in turn is obligated to pay a portion of that account receivable when received to (i) Century 21 as a pre-negotiated royalty (also called a franchise fee) under the Franchise Agreement; and, (ii) the real estate sales persons who procured the listing agreement or the sale.  These obligations are a cost of liquidating the account receivable.  The Debtor generally receives approximately 15% of the total commission generated from as sale after the costs are paid.  This is the amount which the Debtor would net from the account receivable.

In a chapter 7 liquidation, the Debtor would cease operating and only the accounts receivable that existed on the date of conversion to chapter 7 would be

Case: 08-54475    Doc# 199    Filed: 11/29/10    Entered: 11/29/10 15:32:34    Page 19 of 33

available for liquidation.  After payment of the franchise fee and commission owed to the real estate sales persons, which are administrative claims which must be paid first, the funds would next become available to the chapter 7 trustee to pay other costs of administration in the bankruptcy case.  After that, the remaining funds become available to pay to unsecured creditors. Not all accounts receivable will be collected because some sales will not be completed and will not close escrow.  On average, the Debtor has accounts receivable of approximately $800,000 in any given month.  The Debtor estimates that the liquidation value of its accounts receivable after considering the costs of such sales and those sales that may not be completed would net approximately $120,000 to the Bankruptcy Estate.  From that amount, the costs and commission of the chapter 7 trustee would be paid, as well as other administrative expenses such as the chapter 7 trustee's attorney.  The net amount available to unsecured creditors is estimated to be approximately $60,000 to $80,000.

       2.     <u>Deposits and Retainers.</u>

The Debtor has deposits with its landlords of approximately $120,000.  These amounts generally cannot be realized in the event of chapter 7 because leases will usually be rejected and the affected landlord will be entitled to retain its security deposit to partially secure the amount of its lease rejection claim.

The Debtor also has retainer balances with its professionals of $116,500.  This amount will generally not be realized because of the requirement to pay chapter 11 administrative expenses in full before unsecured creditors can be paid.

       3.     <u>Furniture and Fixtures, Office Equipment.</u>

The Debtor's balance sheet reflects furniture and fixtures with a balance sheet

Case: 08-54475   Doc# 199   Filed: 11/29/10   Entered: 11/29/10 15:32:34   Page 20 of 33

value of $78,062. Office equipment is shown on the balance sheet with a value of $47,962. Most, if not all, of the furniture, fixtures and office equipment is old and fully depreciated. The Debtor believes that in the best case the used furniture, fixtures and office furniture may be worth 10% of its book value, if that, before considering the costs of such sale. The net value would be even less. The Debtor therefore estimates that the liquidation value of these assets is at the most $12,602.

        4.   <u>Leasehold Improvements.</u>

Although the Debtor's balance sheet reflects leasehold improvements of $4,526 that amount generally cannot be realized in the event of liquidation because the lease provides that on termination all improvements become the property of the landlord.

        5.   <u>Cash on Hand.</u>

At the time a bankruptcy case converts to chapter 7, any available cash becomes property of the bankruptcy estate and is available to pay the claims of administration, including the expenses of the chapter 7 trustee and the attorneys' fees and expenses of the trustee's professionals. Although the Debtor routinely maintains cash on hand, it is unlikely that cash at the time of conversion to chapter 7 would be sufficient to cover these expenses.

        6.   <u>Administrative Claims.</u>

Under the Plan, Century 21 has agreed to defer payment of its Allowed Administrative claim for post-petition royalties under the Franchise Agreement in the amount of $234,000 (approximate balance as of October, 2010) to help facilitate the Debtor's Plan. In addition, since filing chapter 11, Mr. Zimbrick has deferred a portion of his salary pursuant to his written employment agreement. Through October 1, 2010,

Case: 08-54475   Doc# 199   Filed: 11/29/10   Entered: 11/29/10 15:32:34   Page 21 of 33

this amounts to approximately $120,000 of Allowed Administrative claim for deferred compensation. In a chapter 7 case, both of these amounts would have to be paid before any distributions could be made to allowed unsecured creditors.

Allowed unsecured claims filed, scheduled are estimated to total $1.820 million. The Plan proposes to pay the sum of $500,000 to these creditors over a 5 year term in quarterly installments. Thus, the projected recovery to unsecured creditors is approximately 27%. By contrast, if the case were converted to chapter 7, the Debtor estimates that the assets available to pay unsecured creditors would amount to approximately $60,000 to $80,000 of accounts receivable and $12,602 for furniture, fixtures and office equipment. However, the Allowed Administrative claims of Century 21 and Mr. Zimbrick described above would need to first be paid. Therefore, the estimated recovery to unsecured creditors in a chapter 7 case is zero. The proposed distribution under the Plan therefore exceeds what is available in a chapter 7, so the Plan meets the best interest of creditors test.

## VII. FEASIBILITY

The Bankruptcy Code requires a finding that confirmation of the Plan is not likely to be followed by either liquidation or the need for further reorganization. The Debtor's' ability to perform this Plan and avoid Plan failure and a Chapter 7 conversion requires the Debtor to prove its ability to provide (a) the payments that will be required of it at the Effective Date, (b) the payments that are required of the Debtor under the Plan, particularly at the end of the first full quarter following the Effective Date, and (c) the payments required to complete the Plan. The evidence that the Debtor will be able to

meet each of the aforementioned obligations is found in two sources. First, the cash currently on hand that is available to make required payments, such as administrative claims, on the Effective Date. Second, the Debtor's ability to continue to general real property listing agreements and sales, thereby continuing to earn commissions that will enable the Debtor to make the quarterly payments after the Effective Date. The Debtor's business operations have stabilized while in chapter 11 and the Debtor has shown consistent profits in the last 16 months as reflected in Exhibit "A" attached hereto.

A. Payments Due At The Effective Date

At the Effective Date the Debtor will be obligated to pay the secured claim of the County of Santa Clara Tax Collector and the secured claim of Nguyen. The Debtor has more than sufficient cash on hand to do so. The Debtor must also pay the Allowed Administrative Claims of its professionals, after application of retainers. Again, the Debtor believes that it has more than sufficient cash on hand to do so. The projected total of Allowed Administrative Claims is $135,000 to $145,000.

B. Payment Due at the End of The First Quarter After The Effective Date

One calendar quarter after the Effective Date, the first distribution must be made into the Plan Distribution Account. This amount is $25,000.00. The Debtor will fund this quarterly payment from its operations. The Debtor's historical financial performance since the Petition Date is reflected in Exhibit "A" attached hereto. In particular, the performance during last 12 months reflects profits averaging $14,300 per month. The Debtor fairly expects that these profitability trends will as the real estate market continues to stabilize and recover. Therefore, the Debtor believes that it will be able to pay $25,000 into the Plan Distribution Account by the deadline for the first quarter following the Effective Date

of the Plan, and in the quarters that follow thereafter.  Because the real estate business is prone to seasonal fluctuations (i.e. properties generally sell better in the summer and fall months and sales are slower in the winter and spring), as well as fluctuations based on general economic conditions, the Plan provides the Debtor  with the ability to defer to up to two of the quarterly distribution payments after the first payment is made after the Effective Date to account for the fluctuations in the real estate market and its coinciding impact on the Debtor's general profitability.

C.     Conditions Needed for Plan to Become Effective

The Zimbricks' Plan and the Debtor's Plan are being proposed in conjunction with one another because Edward Zimbrick's employment as President of the Debtor is critical to the Debtor's business operations.  Edward Zimbrick is a real estate professional of over 30 years experience who ran the Debtor as a highly successful company until the general economic decline which contributed to the Debtor's bankruptcy.  Without Edward Zimbrick running the Debtor, the Debtor anticipates that few (if any) of the existing brokers and salespersons would remain and the Debtor would not generate sufficient revenue to meet its Plan payments.  A Final Order of Confirmation in both the Zimbrick Case and in this bankruptcy case prior to the occurrence of the Effective Date is therefore necessary to ensure that one plan doesn't become effective without the other.

D.     Continued Employment by Debtor of Edward Zimbrick

Edward Zimbrick's continued employment as President of Alpha Factors is necessary for the Debtor to meet its Plan obligations.   Edward Zimbrick is a real estate professional of over 38 years who ran a highly successful office until the general

economic decline which contributed to the Debtor's bankruptcy. Without Zimbrick running the Debtor, few (if any) of the existing real estate brokers and salespersons are likely to remain and the Debtor would not generate sufficient revenue to make Plan Distributions.

When the Debtor began to experience financial difficulties, Zimbrick did not receive his full salary and he and his wife together loaned nearly $3 million to the Debtor which they have agreed to subordinate to all other unsecured creditors. Zimbrick is also forgoing under this Plan his Administrative Claims for compensation for the time during which the Debtor has been in bankruptcy.

A key element of this Plan is compensating Zimbrick at the minimum level needed to allow Zimbrick to meet the required plan payments in the Zimbrick Case and to cover the Zimbricks' reasonable living expenses. The terms of the Plan therefore provide that on the Effective Date, the Debtor shall pay Edward Zimbrick a monthly salary of $14,000 plus the following: (i) provide health coverage for Zimbrick and his family; (ii) provide Zimbrick with a company car or automobile stipend in lieu thereof; and (iii) pay all of Zimbricks' post-petition and post-confirmation professional fees that are incurred for services performed in connection with the Zimbrick Case that are not satisfied from cash that the Zimbricks have available on the Effective Date. Edward Zimbrick's monthly salary shall increase approximately 10% per year to take into account expected increases in secured debt payments and property taxes and Zimbrick's salary may be further adjusted so that Zimbrick will not receive a salary from the Debtor that is less than the amount necessary to pay Zimbrick's secured debt obligations, reasonable living expenses and plan payments in the Zimbrick Case.

Case: 08-54475    Doc# 199    Filed: 11/29/10    Entered: 11/29/10 15:32:34    Page 25 of 33

The Debtor believes that it is in creditors' best interest for the Debtor to provide Zimbrick with this compensation (which leaves him with no savings for 5 years but is sufficient to cover his secured debt, plan payments, and reasonable living expenses). Without Zimbrick as President, this Plan simply is not feasible and the Debtor would be forced into Chapter 7 liquidation, which is discussed above in Section VI.  In a chapter 7 liquidation, the estimated recovery for unsecured creditors is zero.

VIII.  <u>FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN</u>

THE FOLLOWING IS A SUMMARY OF CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN THAT MAY BE MATERIAL TO CREDITORS (EACH CREDITOR IS A "HOLDER" AS DESCRIBED IN THIS SECTION OF THE PLAN).  THIS DISCUSSION IS INCLUDED FOR GENERAL INFORMATION PURPOSES ONLY AND IS NOT INTENDED TO BE, AND IS NOT, LEGAL OR TAX ADVICE TO ANY PARTICULAR HOLDER. THIS SUMMARY IS BASED ON THE CURRENT PROVISIONS OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "CODE" AS REFERRED TO IN THIS ARTICLE), THE INCOME TAX REGULATIONS (THE "REGULATIONS") AND OTHER LEGAL AUTHORITIES, ALL OF WHICH ARE SUBJECT TO CHANGE, POSSIBLY WITH RETROACTIVE EFFECT. NO RULINGS FROM THE INTERNAL REVENUE SERVICE (THE "IRS") OR OPINIONS OF COUNSEL HAVE BEEN OR WILL BE REQUESTED CONCERNING THE MATTERS DISCUSSED BELOW. THE TAX CONSEQUENCES SET FORTH IN THE FOLLOWING DISCUSSION ARE NOT BINDING ON THE IRS OR THE COURTS, AND NO ASSURANCE CAN BE GIVEN THAT CONTRARY POSITIONS WILL NOT BE SUCCESSFULLY ASSERTED BY THE IRS OR ADOPTED BY A COURT.

THIS SUMMARY DOES NOT ADDRESS STATE OR FEDERAL INCOME TAX CONSEQUENCES TO INTEREST HOLDERS.

THE FOLLOWING DISCUSSION DOES NOT APPLY TO CERTAIN HOLDERS WHO, DUE TO THEIR PARTICULAR CIRCUMSTANCES, MAY BE SUBJECT TO SPECIAL RULES. THOSE HOLDERS INCLUDE HOLDERS WHO ARE DEALERS IN SECURITIES, FINANCIAL INSTITUTIONS, INSURANCE COMPANIES, TAX-EXEMPT ORGANIZATIONS, OR FOREIGN PERSONS.

A.    IRS Circular 230.

TO ENSURE COMPLIANCE WITH TREASURY DEPARTMENT CIRCULAR 230, HOLDERS ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF FEDERAL TAX ISSUES IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE RELIED UPON, AND CANNOT BE RELIED UPON BY HOLDERS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON HOLDERS UNDER THE INTERNAL REVENUE CODE; (B) SUCH DISCUSSION IS INCLUDED HEREIN BY DEBTORS IN CONNECTION WITH THE PROMOTION OR MARKETING (WITHIN THE MEANING OF CIRCULAR 230) BY DEBTORS OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) HOLDERS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

EACH HOLDER SHOULD CONSULT THE HOLDER'S OWN TAX ADVISOR TO DETERMINE THE HOLDER'S PARTICULAR U.S. FEDERAL INCOME TAX CONSEQUENCES AND OTHER TAX CONSEQUENCES TO THE HOLDER OF THE PLAN, INCLUDING ANY STATE, LOCAL AND FOREIGN TAX LAWS AND THE EFFECT OF ANY CHANGES IN SUCH LAWS.

B.    Consequences to the Debtor.

The Debtor is an Internal Revenue Code Subchapter S corporation.  As such, the Debtor's corporate profits and losses pass through to its sole shareholder, Mr. Zimbrick. After the Effective Date, the Debtor shall continue to pay all pass through taxes associated with corporate profits in the ordinary course of business.

C.    Consequences to Creditors.

Generally, any amount received by a Creditor in satisfaction of an Allowed Claim, to the extent such amount constitutes "gross income" within the meaning of Section 61 of the Code, will be taxable to the Creditor in accordance with the Creditor's method of accounting, if not previously included in the Creditor's gross income. This would include, for example, payments of interest, rent or compensation for services. If a Creditor previously reported as taxable income, their respective Allowed Claim then the unpaid portion of the previously reported taxable income would be deductible as a business bad debt. A Creditor may be subject to regular income tax withholding or backup withholding, as described below, with respect to such payments. Creditors should consult with their own tax advisors as to the character and timing of recognition of any gain, loss or deduction they are planning to include in their tax return.

Any amount received by a Creditor in satisfaction of accrued interest on a Claim will be taxable to the Creditor as interest income, if not previously included in the Creditor's gross income. A Creditor may be subject to backup withholding, as described below, with respect to such interest payments.

Each Creditor who receives cash in partial or complete satisfaction of the Creditor's Claim will recognize gain or loss equal to the difference between the amount of

Case: 08-54475   Doc# 199   Filed: 11/29/10   Entered: 11/29/10 15:32:34   Page 28 of
33

cash received and the Creditor's tax basis in the Creditor's Claim. Gain may be recognized, for example, by a Creditor who acquired a Claim at a discount or who previously reported a bad debt deduction or worthless security loss with respect to all or a portion of the Claim. Generally, any gain recognized will be considered capital gain if the Claim is held as a capital asset, and generally will be ordinary income if the Claim is not held as a capital asset. Capital gain will generally be long-term capital gain if the Claim has been held for more than 12 months. Creditors should consult with their own tax advisors as to the character and timing of recognition of any gain, loss or deduction they are planning to include in their tax return. Any loss will generally be a capital loss if the Claim is a capital asset and if the payment is deemed a "retirement" of the Claim within the meaning of Section 1271 of the Code. A Creditor who receives no payment with respect to a Claim (and a Creditor who receives a payment which is not a "retirement" and incurs a loss) should generally be able to claim a bad debt deduction to the extent of the Creditors tax basis in the Claim (or, in the case of a Creditor receiving a payment, the excess of the tax basis in the Claim over the payment received). A Creditor who holds a Claim as a non-business bad debt and who is not a corporate Creditor will generally only be able to claim a short-term capital loss with respect to such Claim. A Creditor who holds a Claim which is a "security" as defined in Section 165(g) of the Code will generally only be able to claim a capital loss rather than a bad debt deduction. Limitations apply to the ability to deduct capital losses. Creditors should consult with their own tax advisors as to the character and timing of recognition of any gain, loss or deduction they are planning to include in their own tax returns.

Because a loss is allowed only for the tax year in which it is sustained, a Creditor

that claims a loss or deduction in the wrong tax year risks losing the benefit of such loss or deduction in its entirety. Creditors should consult with their own tax advisors as to the character and timing of recognition of any gain, loss or deduction they are planning to include in their own tax returns.

## IX.  CONFIRMATION STANDARDS.

A.  <u>Voting</u>.

In order to confirm the Plan, two-thirds in amount and a majority in number of Allowed Claims in each impaired class of creditors and two-thirds in number of shares in the Allowed Interests must vote in favor of the Plan.   The majorities for each are deter-mined by the number and amount of those who actually vote on the Plan and are entitled to vote on the Plan under Bankruptcy Rule 3018.

If a class which is impaired under the Plan does not vote in favor of the Plan, the Debtor may seek confirmation under Section 1129(b) of the Bankruptcy Code.

B.  <u>Confirmation Standards</u>.

For the Plan to be confirmed and binding on all creditors and shareholders, the Court must determine that the following requirements under Sections 1129(a)(1) through (12) of the Bankruptcy Code has been satisfied:

1.  The Plan complies with the provisions of the Code;

2.  The Plan proponent (the "Debtor") has complied with the provisions of the Code;

3.  The Plan has been proposed in good faith and not by any means forbidden by law;

4.  Any payment made or to be made by the Debtor for services or costs

in connection with the Bankruptcy Case has been or will be subject to approval by the Court as reasonable;

    5.    The Debtor has disclosed the identity of any individual to serve after Confirmation as an officer or director;

    6.    Any rate change provided for the Plan has been or subject to approval by the regulatory commission with jurisdiction over such rates, if any;

    7.    The holder of each claim or interest in each class of impaired claims or interest has accepted the Plan or will receive under the Plan not less than the holder would receive if Debtors' estate were liquidated under Chapter 7 of the Code;

    8.    Each class of claims or interest has accepted or is not impaired by the Plan;

    9.    Holders of allowed claims entitled to administrative priority under the Code will receive Cash in the full amount of their claims on the Effective Date, unless the holder thereof agrees to a different treatment;

    10.    At least one impaired class of claims is accepting the Plan;

    11.    Confirmation is not likely to be followed by liquidation or further reorganization of the Debtor unless such liquidation or reorganization of Debtor's property is proposed in the Plan;

    12.    All fees payable to the U.S. Trustee under 11 U.S.C. §1930 have been paid or the Plan provides for the payment of such fees;

    13.    The Plan provides after its Effective Date for the continuation of all retiree benefits, as and when required by 11 U.S.C. §1129(a)(13); and

    14.    The principal purpose of the Plan is not avoidance of taxes or the

avoidance of the security laws of the United States.

C.    Modification.

Under the Code and the Bankruptcy Rules, the Debtors may, subject to the Code and Bankruptcy Rules and Bankruptcy Court approval, modify the Plan after the Plan has been submitted for acceptance or rejection.  In addition, the Plan may be modified after Confirmation and at any time until the Plan has been substantially consummated by the Debtors or any creditor.  The manner in which the Plan may be modified is set forth in Section 1127 of the Code and Bankruptcy Rule 3019.  In general, the Court may approve a modification of the Plan without a re-solicitation, so long as (a) the Plan, as modified, continues to comply with the applicable provisions of the Bankruptcy Code, and (b) mod-ification does not adversely change the treatment of creditors.

X. CONCLUSION.

A.    Effect of Confirmation.

If the Plan is confirmed, its terms and conditions will be binding on all creditors and the Debtor regardless of how any particular creditor voted to support the Plan.

B.    Recommendation.

This Disclosure Statement has been presented for the purpose of enabling you to make an informed judgment to accept or reject the Plan.  You are urged to read the Plan in full and consult with counsel if you have questions.  The Debtor believes that acceptance of the Plan is in the best interest of all creditors, and will provide the best recovery in this Bankruptcy Case.

Case: 08-54475    Doc# 199    Filed: 11/29/10    Entered: 11/29/10 15:32:34    Page 32 of 33

Dated: November 29, 2010                    ALPHA FACTORS

                                            By: /s/ Edward Zimbrick
                                                Edward Zimbrick, President

Dated: November 29, 2010                    BINDER & MALTER LLP


                                            By: /s/ Julie H. Rome-Banks
                                                Julie H. Rome-Banks
                                                Attorneys for Debtor


F:\Clients\Alpha Factors\Pleading\Plan and Disclosure Statement\Disclosure statement.ecf.tt.10.26.10.doc